IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 17, 2019

## STATE OF TENNESSEE v. FRANCISCO GOMEZ

**Appeal from the Circuit Court for Rutherford County
No. F-75389 Royce Taylor, Judge**

_____

### No. M2018-00529-CCA-R3-CD

_____

Defendant, Francisco Gomez, was convicted of rape of a child and aggravated sexual battery by a Rutherford County jury. The trial court ordered Defendant to serve a total effective sentence of twenty-five years with release eligibility after service of 100% of the sentence in the Tennessee Department of Correction. On appeal, Defendant argues that the trial court erred in excluding his testimony that he was living in Kentucky during the time period when the offenses occurred because Defendant failed to give the State the notice required by Tennessee Rule of Criminal Procedure 12 for alibi evidence. After a thorough review of the facts and applicable case law, we conclude that Defendant's proffered testimony was not alibi evidence, and thus, the trial court erred in excluding it on the ground that Defendant failed to provide notice to the State. However, we also conclude that the error was harmless, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and TIMOTHY L. EASTER, JJ., joined.

David L. Clarke, Murfreesboro, Tennessee, for the appellant, Francisco Gomez.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh T. Ammerman, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

On April 4, 2016, the Rutherford County Grand Jury indicted Defendant on charges of rape of a child and aggravated sexual battery of a minor victim less than thirteen years old.

### *The State's proof*

At trial, the victim, C.M.,[1] testified that she was fourteen years old and currently lived in Arizona. In the summer of 2014, C.M. lived in LaVergne in a neighborhood of houses that contained three separate units. Defendant, his brother, and two other men lived at 234 Barnett Street.

On May 28, 2014, Defendant sent eleven-year-old C.M. a message through Facebook Messenger. Defendant told her to take a shower and then come to the back door of his unit. When C.M. entered the residence around 1 p.m., she observed two beds, a T.V., and a window. Defendant was in the room when she entered. C.M. laid down on one of the beds on her back. C.M. testified that Defendant's penis penetrated her vagina. Defendant also touched her breasts with his hands. Afterwards, C.M. went to her residence, took a shower, and fell asleep. C.M. stated that she informed Defendant's brother about the offenses.

C.M.'s mother took her phone while she was asleep and observed Defendant's message exchange with C.M.[2] Her mother took her to the police station. C.M. testified that she talked about the offenses with the police and with Samantha Richardson at the Child Advocacy Center. C.M. was also examined at a hospital in Nashville.

On cross-examination, C.M. stated that she had been in Defendant's residence previously to the offenses at issue. During cross-examination, Defendant and the State made the following stipulations:

> On June the 3rd, 2014, [C.M.] was interviewed at the Rutherford County Child Advocacy Center regarding allegations that . . . Defendant sexually abused [C.M.]. And said interview was recorded.

---

[1] It is the policy of this court to refer to minor victims of sexual crimes by their initials to protect their identity. We intend no disrespect.

[2] The record does not explain what prompted C.M.'s mother to take her phone.

On June 6th, 2014, Detective Fracker recorded a conversation he had with [C.M.] in the course of his investigations in this case.

On June the 11th, 2014, Detective Fracker recorded a conversation h[e] had with [C.M.] in the course of his investigation in this case.

[C.M.] never mentioned that . . . Defendant touched her breasts with his hand in any of those three recordings.

On redirect examination, C.M. testified that Defendant knew that she was eleven years old at the time of the offenses because she told him her age.

Detective Matt Fracker testified that he worked for the LaVergne Police Department ("LPD") in the Criminal Investigation Bureau. On May 30, 2014, the reporting officer called Detective Fracker to investigate the allegation that Defendant sexually abused C.M. Detective Fracker spoke with C.M.'s mother at the LPD and contacted the Department of Children's Services ("DCS"). When a DCS investigator arrived at the station, Detective Fracker shared the details of the allegations with the investigator, who set up an appointment for C.M. at Our Kids and at the Child Advocacy Center. Later, Detective Fracker picked up a rape kit that Our Kids conducted on C.M. from Metro General Hospital in Nashville. After C.M.'s examination at the Child Advocacy Center, Detective Fracker interviewed C.M. to obtain details of the offenses for the purpose of preparing an application for a search warrant to search Defendant's residence. C.M. described the furniture of the room where she was raped, as well as the fact that Defendant wore "a blue and white striped collared shirt" during the offenses.

Detective Fracker identified a photograph of Defendant that he found on Defendant's Facebook profile page. C.M. identified Defendant as the individual who raped her from this photograph. When Detective Fracker executed the search warrant for Defendant's residence, he found a blue and white striped collared shirt in Defendant's bedroom.

In 2016, Detective Fracker located Defendant in Kentucky. After Defendant was extradited to Rutherford County, Detective Fracker applied for and received a search warrant to obtain Defendant's DNA. On cross-examination, Detective Fracker stated that he did not observe Defendant at the residence when he executed the search warrant.

Denise Alexander testified that she worked as a social worker at Our Kids Clinic, an outpatient clinic associated with Metro General Hospital in Nashville. Ms. Alexander explained that Our Kids provides "medical forensic exams on kids when there [are] concerns of inappropriate touching [or] sexual abuse[.]" On May 30, 2014, Ms.

Alexander met with C.M. at Metro General Hospital. C.M. told Ms. Alexander that she had sexual contact with Defendant on May 28, 2014. A nurse practitioner, Caroline Patterson, performed a medical examination on C.M. and collected swabs of DNA from C.M.

Sue Ross testified that she had worked as a pediatric nurse practitioner for Our Kids since 1990. After the trial court declared Ms. Ross to be an expert in the field of child forensic medical evaluations, Ms. Ross testified that she reviewed Ms. Patterson's report on the medical forensic examination of C.M. Ms. Patterson observed "a small anal fissure with no significance to it" because fissures of that size normally occur with bowel movements. However, Ms. Ross clarified that C.M.'s normal exam did not exclude the possibility of sexual contact. On cross-examination, Ms. Ross explained that a victim taking a shower after sexual contact would affect the likelihood that an external swab would generate evidence.

Special Agent Laura Boos testified that she worked as a forensic scientist for the Tennessee Bureau of Investigation ("TBI") in the forensic biology unit. After the trial court declared Special Agent Boos to be an expert in the field of forensic biology, she stated that she examined evidence submitted to the TBI in July 2014 that was collected from C.M. and the crime scene. Special Agent Boos analyzed buccal swabs from C.M. as a known DNA sample. She also analyzed vaginal swabs from C.M., which did not indicate the presence of semen. She observed a few sperm cells on C.M.'s inner labial swab. Special Agent Boos obtained a DNA profile from the inner labial swab "that was consistent with a mixture of two people." She stated that C.M. was a major contributor to the DNA profile; the partial minor contributor was unknown. Special Agent Boos examined C.M.'s outer labial swab and again found a DNA profile that was a mixture of two contributors. On the outer labial swab, "the major contributor was from the unknown male[,]" and C.M. was a partial minor contributor. Special Agent Boos also found a limited amount of DNA on C.M.'s perineum swab.

Special Agent Boos also examined a shirt found at the crime scene, as well as some drink cans. She did not observe any semen on the shirt, so she did not examine it further. She swabbed the mouth of the cans for DNA and found a DNA profile of an unknown male different from the individual whose DNA was found on C.M.'s outer labial swab.

In June 2016, the TBI received buccal swabs from Defendant. Special Agent Boos compared the known DNA sample from Defendant's buccal swabs to the unknown male DNA that she previously found on C.M.'s outer labial swabs. Defendant's DNA profile matched the DNA profile of the major contributor of that sample. Defendant's DNA was also consistent with the DNA profile found on C.M.'s perineum swab.

Defendant's DNA was not consistent with the minor contributor to the DNA profile found on C.M.'s inner labial swabs. Defendant's DNA was also not consistent with the DNA profile that Special Agent Boos found on the cans found at the crime scene.

On cross-examination, Special Agent Boos stated that, as a sample of DNA ages, the more likely the sample has been "degraded." She explained that a degraded sample "might not get as much of a profile[,]" but the analysis would still be accurate. On redirect examination, Special Agent Boos stated that a DNA profile can be obtained from an item of evidence hours or days after the DNA was transferred to the piece of evidence. Additionally, she explained that the victim taking a shower could reduce the likelihood of obtaining a complete DNA profile on the area swabbed "[d]epending on where the evidence was located and the type of shower that was taken[.]"

### *Defendant's proof*

Defendant testified that, on May 28, 2014, he did not live at the residence at 234 Barnett Street. He stated that he did not know C.M., did not speak to her, and did not have sexual contact with her. He also stated that he did not know how his DNA was transferred onto C.M.'s body.

The jury found Defendant guilty as charged. The trial court sentenced Defendant to twenty-five years with release eligibility after service of 100% of the sentence in the Tennessee Department of Correction for count one, rape of a child. The trial court ordered Defendant to serve a sentence of eight years with release eligibility after service of 100% of the sentence in the Tennessee Department of Correction in count two, aggravated sexual battery. The trial court ordered Defendant to serve his sentence in count two concurrently to his sentence in count one. Defendant filed a timely motion for new trial, which the trial court denied. Defendant now timely appeals.

## II. Analysis

### *Exclusion of alibi testimony*

Defendant argues that the trial court should not have excluded his proposed testimony that he lived in Beaver Dam, Kentucky, during the time period that the offenses occurred because it was not alibi testimony. He notes that his proposed testimony would not have excluded the possibility of him being in LaVergne on May 28, 2014. Alternatively, Defendant asserts that, if the trial court correctly found that his proposed testimony was an alibi, the State failed to file a request for notice of alibi defense as required by Tennessee Rule of Criminal Procedure 12.1(a)(1). The State contends that Defendant's proposed testimony was properly excluded because it was

irrelevant. Additionally, the State responds that if the testimony was relevant and the trial court erred in excluding it, the error was harmless.

We gather from the record that the State filed a motion for reciprocal discovery on July 29, 2016, which the State asserts complied with its burden under Tennessee Rule of Criminal Procedure Rule 12.1(a)(1). During a jury-out hearing after Detective Fracker's testimony, the prosecutor stated that it appeared that Defendant was "driving towards a theory of . . . Defendant being gone from the jurisdiction or not here." The prosecutor stated that the State had not received a notice of alibi from Defendant. After the State rested its case, the trial court held a jury-out hearing. Defense counsel stated that Defendant wanted to testify that, in May 2014, he was living in Kentucky, not in the residence at 234 Barnett Street in LaVergne. Defense counsel acknowledged that Defendant's proposed testimony was not "a strict alibi defense[.]" Defense counsel noted that the State filed "the standard reciprocal discovery which requests alibi notice" but that it did not provide Defendant with the time, date, or place that the offenses allegedly occurred. Defense counsel filed a bill of particulars on August 25, 2017, and the State filed its response on October 16, 2017, which alleged that the aggravated sexual battery occurred "anywhere between May 20th, 2014 and May 29th, 2014." Defense counsel asserted that Defendant was not required to notify the State of his alibi under Tennessee Rule of Criminal Procedure 12 because the State did not provide proper notice to Defendant of when and where the offenses allegedly occurred. Defense counsel noted that, during her trial testimony, the victim provided more details regarding the alleged offenses—that the offenses occurred during the afternoon of May 28 at the 234 Barnett Street residence.

The trial court found that Defendant sought to present alibi testimony and thus Defendant should have notified the State of his intention to present alibi evidence so that the State could investigate the alibi evidence. The trial court found that the State had "complied sufficiently to give notice of the general time and date that the event occurred." The trial court granted the State's motion to "exclude any alibi defense as to the fact that [Defendant] was not in the state during this time period."

This court has previously defined "alibi" as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the relevant time." *State v. Looper*, 118 S.W.3d 386, 416-17 (Tenn. Crim. App. 2003) (quoting *Black's Law Dictionary* 72 (7th ed. 1999)) (concluding that "[i]f the distance and means of travel would have permitted the defendant both to have been at the victim's farm to commit the crime and, later that morning, to have been in Flowery Branch, the proof would not have established an alibi"). Thus, based on this definition of alibi testimony, Defendant's proffered testimony that he was living in Kentucky during the time period of the offenses was not alibi testimony because it did

not create a physical impossibility of Defendant's guilt. The proffered testimony did not place Defendant "in a location other than the scene of the crime at the relevant time." *See id.* Defendant's testimony that he was "living" in Kentucky in May 2014 does not exclude the possibility that he drove to Tennessee on May 28 and had sexual contact with C.M. Further, Defendant acknowledges in his appellate brief that his testimony that "he was living in Beaver Dam, Kentucky in May 2014 does not create an impossibility that he could not have been in LaVergne, Tennessee on May 28, 2014 (the date the victim testified the crime occurred)." Therefore, the trial court erred by excluding Defendant's proposed testimony on the basis that it was alibi testimony and that Defendant had not provided the State with sufficient notice of his intent to present the alibi evidence. Because "evidentiary rulings ordinarily do[] not rise to the level of a constitutional violation[,]" we determine that this is a non-constitutional error that is subject to a harmless error analysis. *See State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003).

The harmless error doctrine recognizes that the central purpose of a criminal trial is to decide factual questions of a defendant's guilt or innocence, and it promotes the public's respect for the criminal process by focusing on the underlying fairness of the trial rather than technicalities or "the virtually inevitable presence of immaterial error." *State v. Rodriguez*, 254 S.W.3d 361, 366 (Tenn. 2008). Under this analysis, a defendant must demonstrate "that the error 'more probably that not affected the judgment or would result in prejudice to the judicial process.'" *Id.* at 371-72 (quoting Tenn. R. App. P. 36(b)). When assessing the impact of a non-constitutional error, appellate courts must review the record as a whole, considering properly admitted evidence of the defendant's guilt. *Id.* at 372 (citing *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)). "The greater the amount of evidence of guilt, the heavier the burden on the defendant to demonstrate that a non-constitutional error involving a substantial right more probably than not affected the outcome of the trial." *Id.* (citing *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003); *State v. Francis*, 669 S.W.2d 85, 91 (Tenn. 1984)). Whether an error was harmless "does not turn upon the existence of sufficient evidence to affirm a conviction or even a belief that the jury's verdict is correct." *Id.* Instead, appellate courts must determine what impact the error may have had on the jury's decision-making. *Id.*

Here, we conclude that the trial court's error in excluding Defendant's testimony was harmless. At trial, C.M. testified that on May 28, 2014, Defendant sent C.M. a message through Facebook Messenger. Defendant told her to take a shower and then come to the back door of his unit. While she was in Defendant's residence, Defendant's penis penetrated her vagina. Defendant also touched her breasts with his hands. C.M. identified Defendant as the individual who raped her from a photograph of Defendant found on Defendant's Facebook profile page. Special Agent Boos testified that Defendant's DNA profile matched the DNA profile of the major contributor of C.M.'s outer labial swabs. Defendant's DNA was also consistent with the DNA profile found on

C.M.'s perineum swab. Thus, the evidence admitted at trial weighs heavily in favor of Defendant's guilt. Defendant has not established that the trial court's error "'more probably that not affected the judgment or . . . result[ed] in prejudice to the judicial process.'" *Rodriguez*, 254 S.W.3d at 371-72 (quoting Tenn. R. App. P. 36(b)). Additionally, as the State notes, "although [Defendant] did not testify he lived in Kentucky, during his testimony . . . [D]efendant denied living at the house where the rape occurred at the time of the offense." Thus, even though the trial court improperly limited his testimony, Defendant had the opportunity to present evidence to the jury through his own testimony that he was not living at the location of the offenses during May 2014. Because the evidence weighed in favor of the State and because Defendant was able to present a defense to the jury, Defendant is not entitled to relief on this ground.

### III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the trial court's judgments.

_____
ROBERT L. HOLLOWAY, JR., JUDGE